

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

___

No. 07-13-00308-CV

___

**IN RE GUARDIANSHIP OF THE PERSON AND ESTATE OF RYAN KEITH TONNER, AN INCAPACITATED PERSON**

___

On Appeal from the County Court
Lubbock County, Texas
Trial Court No. 2012-784,740, Honorable Tom V. Head, Presiding

___

September 15, 2014

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

This is an appeal from an order dismissing an application for complete or partial restoration of the capacity of Ryan Keith Tonner. On appeal, however, Tonner seeks reversal of that order only in part. That is, he does not contend that he regained full mental and physical capacity. Instead, we are asked to hold that the trial court erred in failing to restore "his capacity to marry . . . apply for, consent to, and receive governmental benefits; determine his residence; manage his finances; accept employment; and make routine medical decisions." We affirm.

*Background*

Tonner suffers from mild retardation, lacks impulse control, and has aggression issues for which he takes medication. Due to these conditions, the trial court found him to be totally incapacitated on January 26, 2003, and appointed his grandmother his guardian over his estate and person. Tonner was eighteen at the time. Approximately four years later, his grandmother died, and no successor guardian was appointed despite the continuation of the guardianship. Since the death of his guardian, though, he has not been without daily supervision due to his commitment to the Lubbock State Supported Living Center (State School). The latter has been facilitating many of his daily decisions such as those related to his medical needs.

The record further indicated that since he began taking medication to address his mental conditions, his well-being may have improved. Yet, a psychiatrist testified that the underlying mental conditions remain and will not improve. In other words, he will always have mild retardation, diminished impulse control, and aggressive behavior.

So too does the record suggest that the controversy before us arose from the lack of a guardian. According to Tonner, he sought to move from the State School facility to a group home but could not due to the guardianship. The latter prevented him from unilaterally approving or effectuating the move. It had to be approved by his guardian, but he had none.

Rather than secure the appointment of a substitute guardian, though, he and his counsel petitioned the probate court to end or modify the guardianship. This resulted in the trial court appointing an attorney ad litem to represent Tonner, convening a hearing on the matter, and entertaining evidence. It ultimately dismissed the petition upon

finding that Tonner's "capacity . . . [had] not been restored." Tonner appealed contending that the trial court abused its discretion in dismissing the petition.

*Authority*

The standard of review is one of abused discretion. *See In re Guardianship of Alabraba*, 341 S.W.3d 577, 579 (Tex. App.—Amarillo 2011, no pet.) (stating that we review the decision to appoint a guardian under the standard of abused discretion); *In re Parker*, 275 S.W.3d 623, 632 (Tex. App.—Amarillo 2008, no pet.) (stating that the proper judicial application of the procedures for vesting a guardian with full or limited authority requires the exercise of the trial court's sound discretion). Discretion is abused when the trial court acts without reference to guiding rules or principles; that is, when the decision is arbitrary or unreasonable. *In re Guardianship of Alabraba*, 341 S.W.3d at 579. It is not abused merely because we would have arrived at a different conclusion had we been trier of fact. *Id.* Nor does such an abuse arise when the trial court makes its decision based upon conflicting evidence. *Id.* And, as long as the decision has the support of some evidence of substantive and probative value and comports with controlling rules, we must affirm it.

Next, an incapacitated person is one who, because of a physical or mental condition, is substantially unable to provide food, clothing, or shelter for himself, to care for his own physical health, or to manage his own financial affairs. TEX. PROB. CODE ANN. § 3(p)(2) (West Supp. 2013).[1] A ward or anyone interested in the ward's welfare may petition for an order 1) finding that the ward is no longer an incapacitated person, 2) finding that the ward lacks the capacity to do some or all of the tasks necessary to

---

[1] The Texas Probate Code underwent re-codification in 2014. It is now known as the Texas Estates Code. Because the proceeding at bar began before the effective date of the new code, we apply the statutory law existing when the court made its decision.

3

provide food, clothing, or shelter for himself or herself, to care for the ward's own physical health, or to manage the ward's own financial affairs and granting additional powers or duties to the guardian, and 3) finding that the ward has the capacity to do some, but not all, of the tasks necessary to provide food, clothing, or shelter for himself or herself, to care for the ward's own physical health, or to manage the ward's own financial affairs. *Id.* § 694A(a)(1)-(3). If the ward has the capacity to do some but not all tasks necessary to provide or care for himself, then the petitioner may also seek an order limiting the powers or duties of the guardian and permitting the ward to care for himself or to manage his own financial affairs commensurate with his ability. *Id.* § 694A(3)(A)-(B). However, before the guardianship can be terminated, the trial court must find by a preponderance of the evidence that the ward is no longer incapacitated. *Id.* § 694E(a). The same burden exists regarding modification to the guardianship; that is, before the guardian's powers may be limited, the court must find by a preponderance of the evidence that the "current nature and degree of the ward's incapacity warrants a modification . . . and that some of the ward's rights need to be restored." *Id.* § 694E(c). With the foregoing in mind, we turn to the cause at bar.

Tonner did not question the legitimacy of the initial guardianship imposed on him. And though effort was made at trial to end the guardianship *in toto*, Tonner did not pursue that course of action via appeal. Instead, he sought only the return of his limited rights to marry, to apply for and obtain governmental benefits, to determine his residence, to accept employment, to manage his finances, and to make routine medical decisions. It was also conceded within appellant's brief that "[e]ven if Mr. Tonner . . . [was to win] this appeal, he would remain without capacity as to his rights to vote,

4

operate a motor vehicle, contract, sue and defend lawsuits, and hire employees, since the evidence on record may not support restoration in these areas." And within that concession lies the primary obstacle to a successful attack upon the trial court's order.

For instance, to change one's residence logically requires the person to acquire another home or abode. Unless the abode is to be provided Tonner free of charge, he must either purchase or lease it from a third party. In other words, he must contract with a third party to acquire the abode. Yet, he lacks the capacity to contract in general or acquire through some contractual arrangement a different abode or home in particular. He may wish to move but without the right to contract, he cannot effectuate that wish, and that circumstance prevents us from holding that the trial court abused its discretion in withholding the right to choose a home from Tonner.

The same can also be said of the right to secure employment. That too is inherently a contractual relationship; the employee agrees with a third party to receive pay in exchange for his skills or services. *See Pioneer Casualty Co. v. Bush*, 457 S.W.2d 165, 169 (Tex. App.—Tyler 1970, writ ref'd n.r.e) (stating that an employer-employee relationship is founded in contract, express or implied, oral or written). Without the right to contract and because employment is contractual in nature, the decision to withhold from him the right to obtain employment is not unreasonable or arbitrary.

The inability to contract also makes it illogical to conclude that Tonner has the ability to manage his own finances. Simply put, the limitation prevents him from securing credit cards, obtaining a checking or investment account, and engaging in financial or business arrangements for they are inherently contractual. As the evidence

5

suggests, it may be that he has the ability to manage and protect from theft small amounts of money. Yet, that hardly enables one to reasonably infer that the ward has the capacity to appreciate the burdens of managing, investing, spending, and securing for the future his entire estate. Indeed, a psychiatrist who examined Tonner indicated that Tonner would never be able to address his financial and medical needs without the assistance of a guardian.

That he cannot contract also means he cannot purchase medication, sign consent forms to secure medical attention, or pay for his medical needs. To that, we add the opinion testimony of the aforementioned psychiatrist indicating that without daily assistance from caretakers, Tonner could forgo taking his medications or take them improperly.[2] And, the consequence of that would be the reappearance of the conduct the medication was intended to control, for instance, impulsivity and aggression.[3] So, at the very least, some evidence supports a finding that Tonner was incapable of making his own medical decisions.

Admittedly, there exists evidence of record indicating that Tonner can engage in decision making and rational thought given the appropriate support and help from his caretakers.[4] Yet, therein lies the rub—the need for support, help, and guidance from his

---

[2] Testimony appeared of record indicating that he already refuses, at times, to take his medication. Indeed, Tonner himself said that he would not take his medication when he was "mad." Other testimony disclosed that Tonner would opt, at times, to forego appearing at medical appointments for such reasons as his desire to sleep-in or "he just does not feel the need to attend for the reasons that were given to him to attend." Whether he understood the consequences of those decisions (and even cared about the consequences if he knew them) went undeveloped.

[3] One witness testified that even when taking his medication, Tonner exhibited "aggression like punching, throwing objects at people, kicking, scratching, biting others and using objects as weapons."

[4] An analyst (Christina Sosa) at the State School who has counseled Tonner for six years testified that Tonner has unilaterally engaged in problem solving. The nature of the problems being solved and their complexity went unmentioned, though.

caretakers. His decision making appears dependent on others (such as his caretakers at the State School) providing him the requisite information and options necessary to make those decisions. And, according to some evidence of record, if Tonner was left to choose his own living arrangements, "he does not want to live in a group home and would prefer to live alone in an apartment because no one can steal from him." In other words, he evinced a desire to insulate himself, which insulation could very well preclude the very supervision and input that enabled him to make the decisions he cited as proof of his ability to make decisions.

We further note the testimony of a State School analyst that Tonner 1) "will definitely need a psychologist or behavioral analyst to continue with the programming that we have in place and monitor that," 2) "will need a psychiatrist because he is on psychotropic medication to monitor the effectiveness of those," and 3) "requires a doctor out in the community setting as well as dentistry and all of the typical providers that he would need." To that, we add the opinion of a psychiatrist that without professional support like that provided in a group home or the State School, Tonner would not be a viable candidate for living alone. Such testimony provided evidentiary basis on which the trial court could conclude that Tonner was not capable of living alone.

Another concern involves the character of the testimony provided by those suggesting that Tonner had the ability to marry, vote, apply for governmental benefits, hire employees, and obtain employment. It was conclusory for the most part. Often, the witness would be asked if Tonner could do those things, and then the witness would

7

normally answer in the affirmative but without explanation.[5] Yet, regarding the matter of marriage, for instance, we found no evidence indicating whether the 28-year-old man knew about or was capable of understanding the obligations inherent in marrying someone and maintaining the marital relationship. Nor did anyone explain whether he had the mental capacity and stamina to care for a family for the rest of his life. Again, a preponderance of the evidence had to illustrate that the "current nature and degree of the ward's capacity warrant[ed] a modification" before the modification could occur. Conclusory evidence, or *ipse dixit*, is no evidence. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 817-818 (Tex. 2009) (holding that conclusory evidence has no probative value). And, most importantly, no one testified that Tonner could make any life decision of importance without the support or guidance of his caretakers or medical or mental professionals.

It may be that authority from sister states holds that under the circumstances here present, a limited guardianship should have been imposed. In Texas, though, the nature of the guardianship imposed is dependent upon what is necessary to promote and protect the ward as dictated by his actual mental or physical limitations. TEX. PROB. CODE ANN. § 602 (West Supp. 2003). Texas also vests the trial court with broad discretion to decide both the type of guardianship needed, *id.; In re Boatsman*, 266 S.W.3d 80, 88-89 (Tex. App.—Fort Worth, 2008, no pet.) and the ward's best interests.

---

[5] A witness did explain that Tonner had one or more jobs in the community but had difficulty appearing at work because of his desire to "sleep late." The same witness then opined that he would have to find a job that "would fit his preferred schedule of employment." However, that witness then failed to describe Tonner's skill set. Nor did she attempt to explain the difficulty, if any, Tonner would have in finding employment suitable to his sleep schedule. Similarly omitted was explanation about whether Tonner could comprehend that employment depended upon fulfilling the needs of the employer at the time selected by the employer, not upon the employer adapting to Tonner's "preferred schedule of employment." In short, evidence that Tonner had difficulty keeping jobs in the community falls short of establishing that he had the capability of securing and maintaining viable employment, or so the fact finder could have concluded.

*Eddins v. Estate of Sievers*, 789 S.W.2d 706, 707 (Tex. App.—Austin 1990, no writ). So, the trial court is not necessarily obligated to impose the least restrictive guardianship possible; rather the decision is controlled by the best interests of the ward and the obligation to protect him from himself and others' control. *In re Parker*, 275 S.W.3d at 631-32.

Under the record before us, we cannot say that the trial court abused its discretion in dismissing the petition to dispense with or modify the guardianship. Independence is a laudable goal. Yet, the record contains sufficient evidence to support the trial court's refusal to withhold, at this time, from Tonner the rights he sought here. The more appropriate course of action would be to fill the void created when his grandmother died years ago and appoint him a guardian.

The order dismissing the petition is affirmed.


Brian Quinn
Chief Justice