

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-25-00169-CV

---

**GLEASON & MESSENGER FARMS, LLC, APPELLANT**

**V.**

**JAMES SCOTT D/B/A LONESTAR STEEL BUILDINGS, APPELLEE**

---

On Appeal from the 31st District Court
Wheeler County, Texas
Trial Court No. 14343, Honorable Steven R. Emmert, Presiding

---

May 4, 2026

## MEMORANDUM OPINION

Before DOSS and PRATT, JJ., and QUINN, S.J.[1]

Contracts to build three metal buildings underlie this appeal. Gleason & Messenger Farms, LLC (Gleason), contracted with James Scott, d/b/a Lonestar Steel Buildings (Lonestar), to perform the construction. Gleason intended to use building 1 for storage, while buildings 2 and 3 were intended to serve as "barndominiums" (barndos) within which people would reside. Yet, regarding the barndos, Lonestar's obligation

---

[1] Brian Quinn, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.

consisted of simply pouring slabs and constructing their shells or exteriors; others were to complete them.

Construction of each facility ensued, resulting in complaints by Gleason about the buildings' quality and characteristics. Though the company paid Lonestar for the storage facility and Barndo 2, it only partially paid for Barndo 3. A suit followed with Gleason asserting claims sounding in breached contract and deceptive trade practices. Lonestar counterclaimed for the balance due on Barndo 3. Trial was to a jury, which ultimately rendered a verdict denying Gleason recovery while sustaining Lonestar's claim of breached contract. The trial court entered judgment upon that verdict.

Six issues pend for review. They involve the sufficiency of the evidence, the trial court's exclusion and admission of evidence, the denial of requested jury questions, attorney's fees, and post-judgment interest. We reverse in part.

### Issue One

Gleason's first issue contains multiple sub-issues. Each pertains to the quantum of evidence underlying the jury's rejection of its claims. Generally labelled as attacks upon the factual sufficiency of the evidence underlying the verdicts, one purports to also implicate the legal sufficiency of the evidence underlying Lonestar's recovery against Gleason.[2] We sustain one contention, overrule another, and find no need to address the remaining.

---

[2] In effect, it too is a factual sufficiency attack since Gleason did not brief the legal sufficiency aspect of the contention. Thus, that aspect of the issue was waived and will go unaddressed. *See Smith v. Dixon*, No. 07-20-00197-CV, 2021 Tex. App. LEXIS 5592, at *6 (Tex. App.—Amarillo July 14, 2021, pet. denied) (mem. op.) (finding appellant's issues waived for inadequate briefing and brief lacked substantive argument and citation to legal authority and record).

The pertinent standards of review are settled and need little comment. We cite the parties to *City of Amarillo v. Nurek*, 639 S.W.3d 760 (Tex. App.—Amarillo 2021, pet. denied), for their explanation. Yet, we take a moment to highlight several considerations. First, when attacking solely the factual sufficiency of the evidence underlying a verdict, the party implicitly concedes that the verdict has the support of legally sufficient evidence. *Soap Eng'g, LLC v. Infiniti Integration Servs. Corp.*, No. 07-24-00304-CV, 2025 Tex. App. LEXIS 3944, at *6 (Tex. App.—Amarillo June 10, 2025, no pet.) (mem. op.); *Wolf v. Starr*, 617 S.W.3d 898, 903 (Tex. App.—El Paso 2020, no pet.). Secondly, both standards bar us from simply substituting our interpretation of the evidence for that of the factfinder. *Nurek*, 639 S.W.3d at 765. Under both, the factfinder remains the sole judge of the credibility of the witnesses and the weight to be given their testimony. *In re A.C.B.*, 302 S.W.3d 560, 564 (Tex. App.—Amarillo 2009, no pet.). That said, we turn to the issues.

*Deceptive Trade Practices*

Question One of the jury charge asked whether Scott d/b/a Lonestar Steel Buildings "engage[d] in any false, misleading, or deceptive act or practice that Gleason & Messenger Farms, LLC relied upon to its detriment and that was a producing cause of damages to Gleason & Messenger Farms, LLC?" Via Question Two, the trial court asked the jury to determine if the failure of James Scott d/b/a/ Lonestar Steel Buildings "to comply with a warranty was a producing cause of damages?"[3] To both, the jury answered: "No." Here, Gleason argues that "the following jury findings are against the great weight and preponderance of the evidence: (1) Lonestar did not engage in any false, misleading, or deceptive act or practice that Gleason & Messenger relied upon to its

---

[3] A definition accompanied the question, which definition told the jury that the failure to comply with a warranty meant "[f]ailing to perform services in a good and workmanlike manner."

3

detriment and was a producing cause of its damages and (2) Lonestar's failure to comply with a warranty was not a producing cause of damages to Gleason & Messenger." As can be seen, only the factual sufficiency of the evidence underlying the jury's answers is attacked. So, in effect, Gleason concedes the existence of some evidence or legally sufficient evidence supporting the jury's verdicts. And, in determining the viability of its contentions, we begin by analyzing the factual sufficiency of the evidence underlying the answer to Question Two.

### a.  *Warranty of Good and Workmanlike Performance*

Gleason contracted for the construction of steel buildings, the frames of which were steel tubing. Those tubes were to be welded to each other. Codie Ivins, Gleason's welding expert, inspected 75% of those welds in the two buildings which had yet to be insulated, that is, Barndos 2 and 3. Of that 75%, less than 10% passed his visual inspection. Those that failed depicted 1) porosity (voids within the welds); 2) blow throughs (punctures in the tubing); 3) mere tacks as opposed to complete welds; 4) welds that incorporated paint from the tubing; 5) slag (solidified remains of welding flux); 6) undercuts (welds containing a raised edge that remained unfilled) susceptible to cracking; or 7) welds that did not actually meld together the tubing. Such defects were captured in numerous photos admitted into evidence, a representative sampling of which includes the following:[4]

---

[4] Truly, a picture best paints what words deficiently describe.





Each posed a point of possible failure, according to Ivins. Lonestar did not deny the existence of such welds.

Rather, Lonestar's expert, Jim McCarroll, characterized the defects found by Ivins as merely "cosmetic," "ugly," and "need[ing] to be cleaned-up." Furthermore, cleaning them up, in his view, consisted of using a grinder with a wire brush to remove surface material followed by the use of a MIG welder to reweld the joint. He then added that 1) some welds needed to be "fixed"; 2) he was not "saying they [the welds] was [sic] all good"; 3) he would make the welds "presentable," "fix" the holes, and reweld the porous welds; 4) he would not just leave flux or slag on a weld and "walk-off"; 5) "top side [welds] really didn't look much better"; 6) repairs would run from $2,500 to $4,500; and 7) he had no concern about using the buildings as they were being used when he inspected them, that is, as ***animal shelters***.[5] In short and despite calling them "cosmetic," Lonestar's own expert recognized the presence of welding defects necessitating repair, as did Ivins.

---

[5] Again, Barndos 2 and 3 were to be built as human living quarters, not structures to house livestock or animals. So, McCarroll suggesting the structures as built were fit for housing animals is no evidence that they were fit to house humans.

Indeed, he opined that he would not have left several of the welds he encountered had he been the welder.

To the foregoing, we now add Scott's own words. He was asked "how do you decide – what do you go by to decide if you think the weld is approved or not?" His reply was "[t]he most important thing, I mean, is if they're cracked or pulled apart. If there's – that would be the first sign, is if they haven't held, then structurally they're not good." Welds found in the buildings depicted those very conditions, as illustrated by two of the foregoing pictures. So, some met Scott's own criteria as objectionable or unsatisfactory. Nevertheless, he, like McCarroll, also generally described the welds as merely "ugly" or having "cosmetic" defects. That leads one to reasonably wonder if "ugly" and "cosmetic" included welds of the ilk encompassed by his definition of unapproved. Be that as it may for Scott also suggested they could be "fixed."[6] These opinions of his apparently were derived after conducting his own inspection. Yet, his own words rendered suspect the extent of that inspection. For instance, when queried about it, he could remember "getting up and looking" on only one of the three buildings. "[G]etting up and looking" on only one building weakens the foundation underlying his opinion about the structural acceptability of all the welds in all the buildings.

In turn, the actual welder and Scott's nephew (Head) also acknowledged the presence of "ugly" welds.[7] They needed to be touched up in his view. This witness also described how two other workmen had the initial duty of "tacking" the steel tubing together

---

[6] That harkens to a twist on the old adage of "don't fix what ain't broke" . . . "if it ain't broke, then why fix it."

[7] It seems rather interesting that "ugly" apparently includes welds that do not bridge gaps between the metal, contain pockets of porosity (bubbles), or include holes blown in the surrounding metal.

to set them in place. Once tacked, Head was to then follow up and complete the weld. But, as depicted by exhibits of record, welds were found that simply consisted of tacking; apparently, they were not completed. Head then revealed that, though Gleason was not a welder, only those welds which Gleason questioned would undergo repair or touch-up.

As for evidence about the structural integrity of the welds, several witnesses considered them sound. They arrived at that belief after conducting visual inspections. But again, the extent of those inspections was suspect. To reiterate, Scott merely viewed the welds of one while McCarroll merely stood on the ground to examine ceiling welds. And it seems that those purported inspections missed defects like the ones depicted in the aforementioned pictures.

Performing in a good and workmanlike manner does not mean perfection. It means providing that quality of work done "by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work." *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 354 (Tex. 1987) (op. on reh'g); *accord Ewing Constr. Co. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 37 (Tex. 2014) (same). When the welder charged with welding Gleason's buildings admits to the presence of welds needing to be fixed . . . when expert welders presented by both litigants admit to the presence of welds needing attention . . . and when the jury has before it numerous pictures of numerous welds requiring attention, the jury had overwhelming evidence of work done in less than a good and workmanlike manner. Lonestar's witnesses may call them "cosmetic" or non-structural defects, but those same witnesses nonetheless

8

acknowledged the need for repair. And, Lonestar's own expert provided his estimate as to the monetary cost of those repairs.

To the foregoing we also note undisputed evidence regarding the manner by which a porch and carport were attached to the buildings. In both instances, they were affixed via screws merely screwed into the sheet metal of the respective main building (as opposed to a beam), and such sheet metal was not designed to withstand the load of either a porch or carport. Again, Lonestar did not dispute that; instead, Scott himself acknowledged the condition. He tried to justify it by saying not only that his employees forgot to bring bolts but also that he intended to return to fix the problem. But, like the welds, the defect remained.

In short, the foregoing evidence depicts universal concession as to the need for further repairs. That leads us to hold that the jury's rejection of Gleason's deceptive trade practice claim founded on breached warranty of good and workmanlike conduct was and is so against the great weight and preponderance of the evidence as to render it clearly wrong and unjust. Thus, we sustain issue two, and that requires a new trial on the claim. *See Dubree v. Blackwell*, 67 S.W.3d 286, 289 (Tex. App.—Amarillo 2001, no pet.) (noting new trial to be the applicable remedy when a verdict is not supported by factually sufficient evidence).

### b. Misrepresentations

Next, we turn to Gleason's attack upon the jury's answer to Question One. Again, the factfinder answered "no" when asked if Lonestar "engage[d] in any false, misleading, or deceptive act or practice that Gleason & Messenger Farms, LLC relied upon to its detriment." The purportedly false, misleading or deceptive acts concerned

9

representations about the ability of the buildings to withstand 120 mph winds, the habitability of Barndos 2 and 3, the presence of adequate footing, and out-of-plumb beams.

To reiterate, Gleason believed the jury's answer lacked factually sufficient evidentiary support. So, as before, we begin with the implicit concession about the verdict having legally sufficient evidentiary support. Moreover, our review of the record failed to nudge us toward the precipice of factual insufficiency.

For instance, while Scott knew Gleason intended to use Barndos 2 and 3 as residences, he agreed to construct only a shell resting upon a foundation. An agreement to build a shell lacking electricity, insulation, plumbing and the like, is not an agreement to construct a habitable building. *See Centex Homes v. Buecher,* 95 S.W.3d 266, 273 (Tex 2002) (subst. op. on reh'g) (stating that habitability contemplates a "house that is safe, sanitary, and otherwise fit for human habitation"); *Lutfak v. Gainsborough*, No. 01-15-01068-CV, 2017 Tex. App. LEXIS 4554, at *20 (Tex. App.—Houston [1st Dist.] May 18, 2017, no pet.) (mem. op.) (same). Moreover, various witnesses opined that the finished structures would be suitable for living quarters. As for beams being out of plumb, that is supported by some evidence. But other evidence Lonestar proffered controverts the proposition. The same is true of the footing. While Gleason offered testimony indicating inadequate or absent footing, Lonestar proffered evidence illustrating otherwise. Similarly, Scott testified that the buildings of the ilk at bar can withstand 120 mph winds and have historically withstood high winds. Of course, other evidence or record exists on both sides of the argument. Yet, we need not detail it since we find the evidence underlying the verdict to be factually sufficient. *See Ibarra v. Noah's Roofing &*

10

*Constr.*, 657 S.W.3d 412, 420–21 (Tex. App.—El Paso 2022, no pet.) (stating that because "we uphold the factual sufficiency of the evidence, we need not otherwise give details of all supporting evidence of record"). In effect, the jury was faced with credibility choices and conflicting evidence. The task fell to its members to decided whom to believe and what evidence to credit. And having performed it by rejecting the claim, we cannot say its decision was or is clearly wrong or unjust.

### c. Breached Contract

The remaining subparts of the first issue encompass the answers to Questions 4 and 7. Through 4, the jury said "no" when asked if Lonestar breached its contract with Gleason. Through 7, it said "yes" when asked if Gleason breached the contract by failing to pay. Yet, we need not address either subpart given our earlier disposition of the warranty claim.

Simply put, the warranty of performing in a good and workmanlike manner is implied into construction contracts like those here. See *Nghiem v. Sajib*, 567 S.W.3d 718, 725 (Tex. 2019). Furthermore, the tenor of Lonestar's performance underlies an aspect of Gleason's claim of breached contract. Our having reversed that portion of the verdict finding against Gleason on its good and workmanlike claim effectively nullifies the jury's answer to whether Lonestar breached the contract. That is, if on retrial the factfinder determines that Lonestar failed to perform in a good and workmanlike manner, then it breached its contract with Gleason, and that topic remains open.

As for the viability of the verdict favoring Lonestar's claim of breached contract, a later finding that it breached the same warranty could prevent or otherwise impact Lonestar's recovery. *See Warren v. Denison*, 563 S.W.2d 299, 303 (Tex. App.—Amarillo

11

1978, no pet.) (stating that "a finding that the builder did not complete the contract in a good workmanlike manner does not necessarily mean that he has not substantially performed the contract. The instances of failure to perform in a workmanlike manner are often no more than deviations from perfect compliance, which reduce the recovery on a contract otherwise substantially performed"). So, we are compelled to also return the claims underlying Questions 4 and 7 to the trial court for new trial.

### Issue Two

The next issue implicates the trial court's rulings concerning the exclusion and admission of evidence. Upon consideration of each argument, we overrule the issue for the following reasons.

#### Exclusion of exhibits depicting footing

Regarding the exclusion of Gleason's evidence purportedly "demonstrating Lonestar's failure to install appropriate footings," Gleason both created the evidence and disclosed it to Scott after lapse of the discovery deadline. That resulted in Lonestar objecting to its admission. The trial court sustained the objection because of its policy that "nothing's admissible after the deadline [] [u]nless . . . leave is obtained" and "that stuff doesn't come in that's produced after the date of the – end of the discovery deadline unless there's some extenuating circumstance to grant leave." Before us, Gleason characterizes the decision as reversible because the trial court "refused to consider the lack of surprise or unfair prejudice to Lonestar."

Generally, questions regarding the admission and exclusion of evidence are reviewed under the standard of abused discretion. *Fitzgerald v. Water Rock Outdoors, LLC*, 536 S.W.3d 112, 119 (Tex. App.—Amarillo 2017, pet. denied). Per that standard,

12

"before we can hold that a trial court erred . . ., it is incumbent upon the party having the burden to prove error on appeal (i.e., the appellant) to negate each potential basis supporting the ruling." *In re T.M.*, 33 S.W.3d 341, 348 (Tex. App.—Amarillo 2000, no pet.). We further note authority saying that a party failing to make, amend, or supplement discovery in a timely manner may not introduce in evidence the material or information that was not timely disclosed unless the court finds 1) good cause for the failure *or* 2) the failure does not unfairly surprise or unfairly prejudice the other parties. TEX. R. EVID. 193.6(a)(1)–(2); *Jackson v. Takara*, 675 S.W.3d 1, 6 (Tex. 2023) (per curiam).

Here, the reason offered by the trial court for excluding the evidence in question tends to fall within the ambit of "good cause." That is, Gleason did not obtain leave, based on "extenuating circumstance[s]," to provide its opponent the evidence after the discovery deadline lapsed. That smacks of lacking good cause justifying the failure to timely supplement. On the other hand, the trial court said little about the topic of surprise and prejudice. Yet, surprise and prejudice still justified exclusion of the evidence, as we now discuss.

Lonestar complained about Gleason's failure to comply with the discovery deadline, which apparently fell on July 26, 2024. It also contended that Gleason's expert revealed during an earlier deposition that he had not dug around the buildings to investigate whether Lonestar laid adequate footing. The purported absence of adequate footing served as one basis for Gleason's contention about breached contract and deficient performance. Not until a week before trial and several weeks after the discovery deadline lapsed did Gleason attempt to fill the void. Gleason did not explain to the trial court why its expert witness had not timely attempted to obtain discovery supporting his

13

upcoming opinion. Indeed, Lonestar's counsel noted that Gleason had more than a year to seek discovery upon an important aspect of Gleason's claims but nonetheless waited until the eve of trial to act. Nor did Gleason explain why it had not obtained leave of court to act belatedly. As argued by Lonestar, "[t]his issue [regarding footing] has been from day 1, over 2 years ago, and they just now got a backhoe out there to see what they want to now produce to us."

The foregoing circumstances depict effort by Gleason to fill gaps in its evidence, gaps that Lonestar earlier discovered and intended to exploit. It depicts Gleason's effort to shore up, after the discovery deadline, gaps in expert testimony to be proffered at the impending trial. So, one (including a trial court) can reasonably deduce prejudice and surprise underlying Lonestar's objection. And, even if the trial court did not voice this ground when sustaining the objection, the ground and circumstances supporting it insulate the decision from reversal. As we have observed in the past, a trial court's decision may be upheld even on grounds no one, even the trial court, considered. *See Cantrell v. State*, 280 S.W.3d 408, 411 (Tex. App.—Amarillo 2008, pet. ref'd); *see also CSL Sweatherford, LLC v. Arens*, 668 S.W.3d 431, 437 (Tex. App.—Fort Worth 2023, pet. denied) (noting the obligation to uphold a trial court decision on any theory supported by the record when it does not make findings).

*Evidence of Repair Costs*

The next controversy concerns the exclusion of estimates about the costs to repair the buildings being so high that the only option was to demolish and replace them. Purportedly, such were "crucial to key issues [like] the severity of Lonestar's breaches,

the reasonableness of the costs of repair, and difference-in-value damages." We overrule this complaint, as well.

To the extent that the evidence was relevant to the damages recoverable by Gleason, we further note the presence of testimony admitted of record about the costs involved and how they warranted demolition and reconstruction. According to Gleason's expert, they were "exorbitant," and it was "significantly" less expensive to tear down the existing buildings and "start with new ones." So, assuming the trial court erred in excluding the evidence, the alleged mistake was harmless given the presence of similar evidence admitted elsewhere without objection. *Washington v. State*, No. 07-17-00427-CR, 2018 Tex. App. LEXIS 8319, at *6–7 (Tex. App.—Amarillo Oct. 10, 2018, pet. ref'd) (mem. op.) (holding that, even though the trial court erred in excluding "Granberry's testimony . . . the error was harmless given that substantially identical evidence was admitted elsewhere without objection"); *accord Gonzalez v. Delgado*, No. 01-21-00217-CV, 2022 Tex. App. LEXIS 6747, at *29 n.8 (Tex. App.—Houston [1st Dist.] Sept. 1, 2022, no pet.) (mem. op.) (same).

Gleason's next complaint concerns evidence about flooring and a purported agreement with Lonestar regarding same. At trial, counsel for Gleason asked if "there [were] any other discussions about the way that the barndominiums would be built?" The witness answered, in part, as follows: "I did make sure to tell him I wanted polished concrete floors." That elicited objection from Lonestar founded on the parol evidence rule. The court initially "sustained" that objection. Yet, counsel for Gleason then commented that he "wasn't trying to get beyond that, but besides everybody's talked about polished concrete several times as well as several discussions about other matters

15

that were not within the four corners of the contract." That led the trial court to think further about the matter and utter: "I don't think he [the witness] said it's part of the contract. He just – my understanding was he said he told them – or he – it's his testimony that he told him. Okay. I'm going to allow it. Go ahead." That was followed by counsel for Gleason saying, "And that's all I'm getting at, Judge." Thereafter, the witness was told it was "okay" to "finish" his original answer to the question "about the way that the barndominiums would be built," which the witness did. These circumstances do not depict an exclusion of evidence but, rather, permission for the witness to answer the question propounded to him, over Lonestar's objection. Being allowed to do what it sought provides Gleason no basis for complaining, and we overrule the argument.[8]

*Evidence of Other Suits*

Lastly, Gleason complains of the trial court's refusal to sustain its objection to evidence about other lawsuits it initiated against third parties. Objection came when Lonestar broached the lawsuit involving repairs to a skid steer. Though the trial court overruled the objection, Gleason did not ask for a continuing or running objection as Lonestar developed the topic. Nor did it object each time Lonestar queried the witness about the skid steer dispute. Gleason also remained mute when Lonestar propounded questions about other suits initiated by Gleason and unrelated to the skid steer. Given that additional evidence of the skid steer suit was admitted without objection, as was evidence of the other suits, Gleason waived or failed to preserve the current complaint.

---

[8] As for the suggestion that the trial court somehow generally misapplied the parol evidence rule, we say the following: It allegedly misapplied the rule, according to Gleason, because parol evidence involving other aspects of the parties' agreement was admitted. Yet, Gleason does not direct us to where anyone objected or otherwise urged the rule to bar admission of evidence at those times. We hesitate to conclude that because unobjected-to parol evidence came in elsewhere means all parol evidence, even that which is inadmissible and to which one objects, automatically becomes admissible.

*See In re A.J.C.*, No. 07-24-00331-CV, 2025 Tex. App. LEXIS 1650, at *3 (Tex. App.—Amarillo Mar. 12, 2025, no pet.) (mem. op.) (holding that the complaint was not preserved because the complainant failed to object each time the evidence was admitted or otherwise request and obtain a running objection to that evidence); *see also Lubbock Cnty. v. Reyna*, No. 07-19-00330-CV, 2021 Tex. App. LEXIS 33, at *10–11 (Tex. App.—Amarillo Jan. 5, 2021, no pet.) (mem. op.) (holding that complaint was waived due to the lack of repeated objections or securing a running objection).

### Issue Three

Via this issue, Gleason contends that the trial court erred in denying its request to submit jury questions on 1) Lonestar's purported breach of the implied warranty of habitability and 2) his alleged knowing and intentional misrepresentation concerning the quality of the buildings. We first review the decision regarding the question of breached warranty of habitability.

The pertinent standard of review is one of abused discretion. *See Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) (stating that appellate courts "review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review"). "Discretion is abused when the trial court acts without reference to guiding rules or principles; that is, when the decision is arbitrary or unreasonable." *In re Guardianship of Tonner*, 514 S.W.3d 242, 243 (Tex. App.—Amarillo 2014), *aff'd*, 513 S.W.3d 496 (Tex. 2016) (per curiam). We cannot say the trial court abused its discretion in refusing the question about breaching the warranty of habitability. This is so because the decision actually comports with the law.

17

Assuming *arguendo* that all involved knew Barndos 2 and 3 were to be residences, no one denies that Lonestar's contractual obligation consisted of only building shells and laying foundation. In other words, the obligation merely consisted of providing incomplete abodes. This is of import given the words of our Supreme Court in *Centex Homes v. Buecher*. There, it said 1) the warranty of habitability, as opposed to one involving good and workmanlike performance, "looks only to the ***finished*** product," and 2) it "is a result oriented concept." *Centex*, 95 S.W.3d. at 273 (emphasis added). It further explained that "[a]s compared to the warranty of good workmanship, 'the warranty of habitability represents a form of strict liability since the adequacy ***of the completed structure*** and not the manner of performance by the builder governs liability.'" *Id.* (quoting Timothy Davis, *The Illusive Warranty of Workmanlike Performance: Constructing a Conceptual Framework*, 72 NEB. L. REV. 981, 1015 (1993)). If nothing else, these words restrict the warranty of habitability to the provision of completed facilities. Lonestar's obligations did not encompass the provision of finished homes but, rather, building shells. So, unless one ignores *Centex*, Gleason was unentitled to the issue sought. Moreover, Gleason's mention of *March v. Thiery*, 729 S.W.2d 889 (Tex. App.—Corpus Christi–Edinburg 1987, no writ), does not change this for several reasons.

First, the court in *March* said nothing of *Centex*; of course, this may be because the former intermediate court opinion was issued years before the latter Supreme Court opinion. And, we all know Supreme Court rulings control. Second, and unlike the circumstances here, the builder of the unfinished home and his family in *March* actually lived in the abode for several years before selling it to Thiery. *Id*. at 892. This suggests the abode was intended to be habitable at time of sale. Here, the structure in question

was a mere shell, lacking the amenities rendering the structure safe, sanitary, and otherwise fit for human habitation.  *See Centex*, 95 S.W.3d at 273 (stating that habitability contemplates a "house that is safe, sanitary, and otherwise fit for human habitation").  As we noted earlier, Lonestar having contracted to construct only a shell, it did not agree to provide a house that is "safe, sanitary, and otherwise fit for human habitation."  Nor can it be logically said the buyer contracted for a "house" or residence that is "safe, sanitary, or otherwise fit for human habitation" when seeking only a shell.  And, this may be why our Supreme Court contemplated a finished product or residence in *Centex* as a prerequisite to the existence of the warranty of habitability.

Finally, we are a bit troubled by a potential piecemeal application of the concept if it is applied to construction short of complete.  For instance, if an entity charged only with erecting the slab, walls, and roof did so quite satisfactorily while a later contractor wired or plumbed the abode so poorly it was not habitable, would the former be responsible for the inhabitability of the house?  After all, the edifice was not habitable when the former finished its work and remained so due the poor craftmanship of later individuals.  Displacing *Centex* with *March* could leave contractors exposed to liability for downstream activities over which they had no control.  Applying *Centex* as written avoids that likelihood.

In short, we overrule that portion of Gleason's fourth issue pertaining to the warranty of habitability.  That leaves us with the complaint about refusing to submit a question on whether Lonestar's purported deceptive trade practices (i.e., misrepresentations and warranty breaches) were knowing or intentional.  Our earlier disposition of the factual sufficiency disputes relieves us from the need to address the

19

matter at this time. That is, the omission grew moot viz-à-vis the allegation of misrepresentation since the jury found none. As for the allegation of breached warranty, that claim is being retried, and the relevance of the instruction likely depends upon the tenor of evidence admitted at retrial.

### Issue Five

Next, Gleason attacks the attorney's fees awarded Lonestar. The latter sought such fees for successfully pursuing its claims involving breached contract, violation of the prompt payment statute, and enforcement of mechanic's liens. Apparently, each was founded upon Gleason's alleged failure to pay Lonestar for successfully performing its contractual obligations regarding Barndo 3.

Lonestar based its claim to attorney's fees upon § 38.001 of the Texas Civil Practice and Remedies Code[9] and § 28.005 of the Texas Property Code.[10] Our earlier disposition of the first issue requires a new trial. The outcome of that new trial may influence the decision to award attorney's fees and the amount of fees to award. For that reason, we sustain issue five, reverse the attorney's fees awarded Scott and Lonestar, and remand the issue for new trial as well. *See Pointe West Ctr., LLC v. It's Alive, Inc.*, 476 S.W.3d 141, 152–53 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (stating that because the court remanded for new trial one of Pointe West's breach-of-contract claims, it must also remand its claim for attorneys' fees related to the claim).

---

[9] *See* TEX. CIV. PRAC. & REM. CODE § 38.001(a) (permitting the recovery of reasonable attorney's fees if the claim is for rendered services, performed labor, or breach of an oral or written contract).

[10] *See* TEX. PROP. CODE § 28.005(b) (stating that an in action brought under this chapter of the Prompt Payment Act, the court may award costs and reasonable attorney's fees as it determines equitable and just).

20

***Issue Six***

In its final issue, Gleason contends that the trial court erred when ordering in the final judgment that the sums due from it accrue "post-judgment interest at the rate of 18 percent (18%) per month." As with issue five, this one too is dependent upon the outcome of a new trial. So, we sustain it.

In sum, we reverse the judgment of the trial court and remand for new trial on all matters except for the cause of action arising under the Texas Deceptive Trade Practices Act and founded upon alleged misrepresentations uttered by Scott and Lonestar.

Brian Quinn
Senior Justice